RICHARD ST. JOHN (State Bar No. 202560)
Richard.StJohn@mto.com
TINA CHAROENPONG (State Bar No. 242024)
Tina.Charoenpong@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Telephone:   (213) 683-9100
Facsimile:    (213) 687-3702

JESSICA TARAN (State Bar No. 224025)
JTaran@wilkauslander.com
WILK AUSLANDER LLP
675 Third Avenue
New York, NY 10017-5704
Telephone:   (212) 981-2313
Facsimile:    (212) 752-6380

Attorneys for Defendant and Counter-claimant
GREEN EARTH TECHNOLOGIES, INC.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATHEW ZUCKERMAN, an individual; INTERMOUNTAIN MARKETING & FINANCE, INC., a corporation; TREYA, INC., a corporation; and LORA JAKOBSEN as Trustee of the Mathew Mark Zuckerman Trust dated December 20, 2004,<br><br>        Plaintiffs,<br><br>        vs.<br><br>GREEN EARTH TECHNOLOGIES, INC., a corporation,<br><br>        Defendant.<br><br>AND RELATED COUNTERCLAIMS | CASE NO.  CV 10-01240 PA (FFMx)<br><br>**STATEMENT OF GENUINE DISPUTES BY DEFENDANT/COUNTERCLAIM PLAINITFF GREEN EARTH TECHNOLOGIES, INC.**<br><br>Date:   January 10, 2011<br>Time:   1:30 p.m.<br>Dept.:   15<br><br>Complaint filed:   November 17, 2009<br>Trial Date:         March 15, 2011 |

451688v3

1    Defendant/Counterclaimant Green Earth Technologies, Inc. respectfully
2    submits the following Statement of Genuine Disputes in accordance with Local
3    Rule 56-1 and with the order of the Court, dated July 7, 2010, in opposition to
4    plaintiffs' Motion for Partial Summary Judgment.

| Plaintiff/Counterclaim Defendant's Stated Fact | Defendant/Counterclaimant's Response |
|---|---|
| 1.     In June 2007, Dr. Zuckerman, Jeffrey Loch and Louis Petrucci (collectively, the "Founders") began doing business as Green Earth Technologies, Inc. ("GET"). | **<u>DISPUTED</u>**<br>➢ Zuckerman Decl. ¶ 3, 6<br>➢ Adams Decl. ¶ 1. |
| 2.     GET was intended to produce G-branded superior performing green products made with American-Grown Base Oils that utilize the power of nanotechnology to deliver environmentally friendly products. | **<u>UNDISPUTED</u>**<br>➢ Zuckerman Decl. ¶ 4 |
| 3.     At the time Dr. Zuckerman, Mr. Loch and Mr. Petrucci founded GET, they entered into a "Founder's Memo of Understanding" dated June 19, 2007 (the "Founders' Memo"). | **<u>DISPUTED</u>**<br>➢ Zuckerman Decl. ¶ 3; Exhibit 15<br>➢ Loch Decl. ¶ 1. |
| 4.     The Founders' memo distributed ownership of the company. | **<u>DISPUTED</u>**<br>➢ Zuckerman Decl. ¶ 5<br>➢ Loch Dec. ¶ 2 |
| 5.     GET was created from a corporation owned entirely by Dr. | **<u>DISPUTED</u>**<br>➢ Zuckerman Decl. ¶ 3 |

| | |
|---|---|
| Zuckerman. | ➢ Adams Decl. ¶ 1 |
| 6.      Dr. Zuckerman was the only stockholder in GET prior to the Founders' Memo. | **<u>DISPUTED</u>**<br>➢ Zuckerman Decl. ¶ 5<br>➢ Adams Decl. ¶ 1 |
| 7.      Under the terms of the Founders' Memo, Dr. Zuckerman would contribute services to GET as its Chief Executive Officer and President as well as intellectual property including six United States Patent Applications (collectively, the "Patent Applications"); and Mssrs. Lock and Petrucci would provide services to GET as its Vice Presidents of Marketing and Sales, respectively. | **<u>UNDISPUTED</u>**<br>➢ Zuckerman Decl. ¶ 6, 8 |
| 8.      By signing the Founder's memo on June 19, 2007, the Founders each approved of their and each others' contributions to GET and the compensation they would receive in stock or otherwise from GET. | **<u>DISPUTED</u>**<br>➢ Zuckerman Decl. ¶ 10.<br>➢ Loch Decl. ¶ 1-5 |
| 9.      By signing the Founders' Memo, Mr. Loch and Mr. Petrucci approved of Dr. Zuckerman's retention of 12,000,000 shares of GET stock for the technology Dr. Zuckerman contributed to GET, including the Patent | **<u>DISPUTED</u>**<br>➢ Zuckerman Decl. ¶ 9, 10<br>➢ Loch Decl. ¶ 5 |

| | |
|---|---|
| Applications. | |
| 10.     After signing the Founder's Memo, Dr. Zuckerman, Mr. Loch and Mr. Petrucci constituted 100% of GET's stockholders. | **DISPUTED** <br> ➢ Zuckerman Decl. ¶ 5 <br> ➢ Adams Decl. ¶ 2 |
| 11.     Mr. Marshall joined GET as its President and Chief Executive Officer in February 2008. | **UNDISPUTED** <br> ➢ Zuckerman Decl. ¶ 14 |
| 12.     When Mr. Marshall joined, Dr. Zuckerman resigned as GET's Chief Executive Officer and became GET's Chairman. | **DISPUTED** <br> ➢ Zuckerman Decl. ¶ 14. <br> ➢ First Amended Complaint ¶ 13, 17, 19 |
| 13.     At an August 15, 2008 GET board of directors meeting, Dr. Zuckerman discussed with the board the possibility of entering the fuels business and offered the board the opportunity to purchase and distribute PFM, a fuel additive developed and manufactured by another. | **DISPUTED** <br> ➢ Zuckerman Decl. ¶ 17. <br> ➢ Marshall Decl. ¶ 6, Exhibit A |
| 14.     GET's board of directors informed Dr. Zuckerman that GET had no interest in PFM because GET did not consider PFM to be a "green" product by its standards—it was toxic and flammable—and because GET did not have the financial, human, or laboratory | **DISPUTED** <br> ➢ Zuckerman Decl. ¶ 17 <br> ➢ Loch Decl. ¶13-16 |

| | |
|---|---|
| capacity to pursue the opportunity. | |
| 15.     Only after GET refused the opportunity to participate in the distribution of PFM, did Alkane, Inc. ("Alkane"), another corporation for which Dr. Zuckerman served as Chief Executive Officer and President, but which had no operations at the time, begin making plans to sell a version of PFM. | **DISPUTED**<br>➢ Zuckerman Decl. ¶ 18<br>➢ Loch Decl. ¶ 13-16 |
| 16.     Alkane only sold PFM for a short period of time and Alkane no longer sells this product. | **UNDISPUTED**<br>➢ Zuckerman Decl. ¶ 18 |
| 17.     In August 2008, Dr. Zuckerman began negotiating an employment agreement with GET. | **UNDISPUTED**<br>➢ Zuckerman Decl. ¶ 19 |
| 18.     As of August 2008, Dr. Zuckerman was operating under the terms of the Founders' Memo, and was being paid as a consultant to GET. | **DISPUTED**<br>➢ Zuckerman Decl. ¶ 19<br>➢ Adams Decl. 5, Exhibit A |
| 19.     The employment agreement between Dr. Zuckerman and GET was not finalized or effective until January 5, 2009 (the "Employment Agreement"). | **DISPUTED**<br>➢ Zuckerman Decl. ¶ 20; Exhibit 20.<br>➢ Adams Decl. ¶ 7, Exhibit C |
| 20.     Under the terms of the Employment Agreement, on January 5, 2009, GET issued to Plaintiff Treya | **DISPUTED**<br>➢ Zuckerman Decl. ¶ 21; Exhibit 15; Exhibit 20. |

DEFENDANT/COUNTERCLAIMANT'S STATEMENT OF GENUINE DISPUTES

| | |
|---|---|
| 1,900,000 shares of stock that Dr. Zuckerman was owed under the Founders' Memo | ➤ Adams Decl. ¶ 6; Exhibit B |
| 21.　Section 8 of the Employment Agreement contained non-competition provisions and non-solicitation provisions which restricted Dr. Zuckerman's ability to work in related fields, hire others, and seek business, amongst other restrictions (the Non-Compete Provisions"). | **UNDISPUTED**<br>➤ Zuckerman Decl. ¶ 22; Exhibit 20 |
| 22.　Dr. Zuckerman intended to fulfill all his obligations under the Employment Agreement at the time he entered into it. | **DISPUTED**<br>➤ Zuckerman Decl. ¶ 24<br>➤ Loch Declaration ¶ 17; Adams Declaration ¶ 9 |
| 23.　Dr. Zuckerman's position as the Chief Operating Officer of a company that lacked adequate capital began causing him increasing stress and he began frequently experiencing incidents of irregular heart beats. | **DISPUTED**<br>➤ Zuckerman Decl. ¶¶ 26-27<br>Evidentiary Objection: Rule 701 of the Federal Rules of Civil Procedure. |
| 24.　Dr. Zuckerman, had previously suffered a heart attack which required corrective heart surgery consisting of six bypasses and had collapsed on a plane while traveling for GET business in July 2008. | **UNDISPUTED**<br>➤ Zuckerman Decl. ¶ 27 |

| | |
|---|---|
| 25.    When Dr. Zuckerman reported the arrhythmia to his primary care doctor, he was advised that he should take immediate steps to reduce the stress in his life. | **DISPUTED**<br>➤ Zuckerman Decl. ¶ 27.<br>Evidentiary Objection: Rule 802 of the Federal Rules of Civil Procedure |
| 26.    Because of his health issues and issues related to working with Mr. Marshall, Dr. Zuckerman resigned from GET on January 31, 2009. | **DISPUTED**<br>Zuckerman Decl. ¶ 28; Exhibit 21.<br>Evidentiary Objection: Rule 802 of the Federal Rules of Civil Procedure |
| 27.    Upon his resignation, Dr. Zuckerman offered to work as a consultant for GET, but GET did not take him up on that offer | **UNDISPUTED**<br>➤ Zuckerman Decl. ¶ 28. |
| 28.    After resigning from GET, Dr. Zuckerman had no control whatsoever over GET. | **DISPUTED**<br>➤ Zuckerman Decl. ¶ 31.<br>➤ Adams Decl. ¶ 13 |
| 29.    In a press release issued by GET announcing Dr. Zuckerman's resignation, Mr. Marshall said, "We are very grateful for all of Dr. Mat Zuckerman's hard work and invaluable contributions" to GET, and in a letter to Dr. Zuckerman, Janet Jankura, the chair of GET's compensation committee, wrote on behalf of GET: "The Board has also asked me to convey to you it thanks for all your hard work on behalf of GET. | **UNDISPUTED**<br>➤ Zuckerman Decl. ¶ 29; Exhibits 22-23. |

| | |
|---|---|
| Your contributions have been invaluable and will be missed.  We all wish you much luck and success in your future endeavors." | |
| 30.    Before resigning, Dr. Zuckerman transferred certain of his GET shares to the other Plaintiffs in this action; entities controlled by him and/or his immediate family. | **UNDISPUTED**<br>➢ Zuckerman Decl. ¶ 30. |
| 31.    At the time Plaintiffs filed this lawsuit in November 2009, they collectively owned 10,434,480 shares of GET stock.  GET has acknowledged Plaintiffs' shareholdings in filings with the Securities and Exchange Commission and admissions in this lawsuit. | **UNDISPUTED**<br>➢ Zuckerman Decl. ¶ 30; Totino Decl. ¶ 12; Exhibit 11 (Responses to interrogatories number 1 and 23); Totino Decl. ¶ 13; Exhibit 12 (Responses to request for admission number 1); Totino Decl. ¶ 14; Exhibit 13 at pp. 32, 47. |
| 32.    On February 25, 2009 GET sent a letter to its stock transfer agent, First American Stock Transfer, Inc. ("FAST"), alerting FAST that Dr. Zuckerman had resigned and that, "effective immediately" it could "accept no direction from Mr. Zuckerman as it relates to matters involving GET. | **UNDISPUTED**<br>➢ Zuckerman Decl. ¶ 33; Exhibit 25; GET Answer (Docket #69) ¶ 19. |

| | |
|---|---|
| 33.     On April 7, 2009, GET sent Dr. Zuckerman a letter informing him that he would cease "to be an 'affiliate' [of GET] for purposes of Rule 144" on May 2, 2009. | **<u>DISPUTED</u>**<br>➢ Zuckerman Decl. ¶ 31; Exhibit 24.<br>➢ Adams Declaration ¶ 12 |
| 34.     In early May 2009, Plaintiffs asked FAST to reissue their GET stock certificates without restrictive legends. | **<u>UNDISPUTED</u>**<br>➢ Zuckerman Decl. ¶ 32. |
| 35.     Upon asking FAST to reissue GET stock certificates without restrictive legends, Plaintiffs were able to sell some of their GET stock starting in May, 2009. | **<u>DISPUTED</u>** Plaintiffs sold some of their stock in January and February 2009.<br>➢ Zuckerman Decl. ¶ 32<br>➢ Taran Decl. ¶ 8, Exhibit F |
| 36.     In July 2009, Mr. Marshall contacted Dr. Zuckerman regarding a potential buyer he had located through an investment bank and suggested that a sale of some of Plaintiffs' shares could be arranged if they agreed not to sell some of their other shares for a period of time. | **<u>UNDISPUTED</u>**<br>➢ Zuckerman Decl. ¶ 36; Exhibit 26. |
| 37.     The opportunity presented by Mr. Marshall of a potential buyer to purchase some of Dr. Zuckerman's shares did not pan out. | **<u>UNDISPUTED</u>**<br>➢ Zuckerman Decl. ¶ 36 |

| | |
|---|---|
| 38.  In August 2009, Plaintiffs' broker contacted AST regarding additional shares. | **<u>DISPUTED</u>**<br>➤ Zuckerman Decl. ¶ 35.<br>Evidentiary Objection: Rule 802 of the Federal Rules of Civil Procedure |
| 39.  In August 2009, Plaintiff's broker submitted Plaintiffs' GET stock certificates, one-at-a-time, to AST for transfer to street name and commenced selling certain of the shares. | **<u>DISPUTED</u>**<br>➤ Zuckerman Decl. ¶ 37.\<br>Evidentiary Objection: Rule 802 of the Federal Rules of Civil Procedure |
| 40.  On September 9, 2009, Plaintiffs learned that GET had instructed AST to put an account level stop on transfers of their shares, preventing Plaintiffs from selling or transferring their shares. | **<u>DISPUTED</u>**<br>➤ Zuckerman Decl. ¶ 38.<br>Evidentiary Objection: Rule 802 of the Federal Rules of Civil Procedure |
| 41.  In response to GET's instruction for AST to put an account stop on transfers of Plaintiff's shares, AST refused to permit any activity with respect to Plaintiffs' shares. | **<u>DISPUTED</u>**<br>➤ Zuckerman Decl. ¶ 38.<br>Evidentiary Objection: Rule 802 of the Federal Rules of Civil Procedure |
| 42.  Despite GET's previous statement that Dr. Zuckerman would cease being an affiliate of Green Earth for purposes of Rule 144 as of May 2, 2009, GET claimed that it could not allow Plaintiffs to transfer the shares because Dr. Zuckerman was an affiliate, and | **<u>UNDISPUTED</u>**<br>➤ Zuckerman Decl. ¶ 39; Totino Decl. ¶ 3; Exhibit 2. |

-9-

| | |
|---|---|
| requested a legal opinion that Dr. Zuckerman was not. | |
| 43.   On November 4, 2009, Plaintiffs submitted to GET a legal opinion reflecting that Dr. Zuckerman was not an affiliate of GET. | **UNDISPUTED**<br>➢ Zuckerman Decl. ¶ 39; Totino Decl. ¶ 4; Exhibit 3. |
| 44.   Rather than honor this legal opinion submitted on November 4, 2009 and allow the transfer of the shares, GET continued to refuse to allow Plaintiffs to transfer their shares. | **UNDISPUTED**<br>➢ Zuckerman Decl. ¶ 39; Totino Decl. ¶ 4. |
| 45.   GET never provided Plaintiffs with any specific criticisms of the legal opinion. | **DISPUTED**<br>➢ Zuckerman Decl. ¶ 40; Totino Decl. 4.<br>➢ Adams Decl. ¶ 18-19 |
| 46.   By letter dated November 9, 2009, and without so much as mentioning the legal opinion, GET asserted that it could prevent Plaintiffs from selling their stock because the technology assigned by Dr. Zuckerman to GET did not have as much value as GET thought it did, that GET had concerns about certain stock trading by unrelated parties, and that Dr. Zuckerman allegedly violated the Non-Compete Provisions. | **DISPUTED**<br>➢ Zuckerman Decl. ¶ 40; Exhibit 27.<br>➢ Marshall Decl. ¶ 5 |
| 47.   Over this period of delay where | **DISPUTED** |

| | |
|---|---|
| Dr. Zuckerman and Plaintiffs were prevented from selling their GET Stock, GET's stock price dropped substantially, causing Plaintiffs to lose millions of dollars. | ➢ Masters Decl. ¶¶ 3-4; Exhibit A.<br>➢ Taran Decl. ¶ 10, Exhibit H |
| 48.    After Plaintiffs had sold their other GET shares, Plaintiff Treya was left with one certificate for 1,900,000 shares of GET stock. | **UNDISPUTED**<br>➢ Zuckerman Decl. ¶ 41; Exhibit 28 |
| 49.    The 1,900,000 GET Shares held by Plaintiff Treya, were the shares issued on January 5, 2009 pursuant to the Founder's Memo and Employment Agreement, and Plaintiff did not attempt to remove the restrictive legend from these shares until January 13, 2010. | **DISPUTED**<br>➢ Zuckerman Decl. ¶¶ 41-42<br>➢ Loch Decl. ¶ 6 |
| 50.    On January 13, 2010, Plaintiff submitted a legal opinion regarding these shares, but GET again refused to honor it, causing delay in Plaintiff's ability to sell its shares. | **UNDISPUTED**<br>➢ Zuckerman Decl. ¶ 42; Totino Decl. ¶; Exhibit 7. |
| 51.    In May 2009, Dr. Zuckerman applied for a U.S. Patent on a product to be sold and added to diesel fuel. | **UNDISPUTED**<br>➢ Zuckerman Decl. ¶ 45. |
| 52.    The product developed by Dr. Zuckerman after his resignation from GET became Monster Diesel and is sold | **DISPUTED**<br>➢ Zuckerman Decl. ¶ 45.<br>➢ Taran Decl., Exhibit C; Loch |

| | |
|---|---|
| by Alkane. | Decl. ¶ 17; Adams Decl. ¶ 9 |
| 53.    Unlike products offered by GET, Monster Diesel contains chemicals that are not biodegradable, are potentially hazardous to humans, and some of which are characterized as flammable. | **UNDISPUTED**<br>➢ Zuckerman Decl. ¶ 46; Exhibit 30-30. |
| 54.    Dr. Zuckerman did not begin work on the patent application for Monster Diesel until after he resigned from GET. | **DISPUTED**<br>➢ Zuckerman Decl. ¶ 45<br>➢ Taran Decl., Exhibit C |
| 55.    GET claims that it had a right to refuse to register the transfer because (1) Dr. Zuckerman, pursuant to Rule 144 promulgated under the Securities Act of 1933, 17 C.F.R. section 230.144, ("Rule 144"), was an affiliate of GET after May 1, 2009 by virtue of the fact that Plaintiffs owned more than 10% of GET's outstanding stock (allegedly 12.7%) and Dr. Zuckerman's prior ability to control GET through the positions he held before resigning, and (2) under Rule 144 Dr. Zuckerman would be considered an underwriter of GET stock with respect to the 1,900,000 shares issued under the Employment Agreement, thus rendering Plaintiffs | **UNDISPUTED**<br>➢ Totino Decl. ¶ 12; Exhibit 1. (Response to interrogatory number 1). |

| | |
|---|---|
| unable to sell their stock under the safe harbor provisions of Rule 144. | |
| 56.   As of at least November 3, 2009, Dr. Zuckerman did not own a voting majority of GET's stock. | **DISPUTED**<br>➢ Totino Decl. ¶ 4; Exhibit 3<br>➢ Adams Decl. ¶ 13 |
| 57.   Treya did not attempt to sell the 1,900,000 shares of GET stock issued to it on January 5, 2009 until January 13 2010 and did not plan to sell the stock, when it acquired it. | **DISPUTED**<br>➢ Zuckerman Decl. ¶ 42<br>➢ Taran Decl., Exhibit F |
| 58.   The highest price of GET's stock within a reasonable time after GET's interference in August and September of 2009 was $1.06 on October 21, 2009, and the highest price of GET's stock within a reasonable amount of time after GET's interference in January 2010 was $.45 on January 27, 2010. | **DISPUTED** the term "interference"<br>➢ Masters Decl. ¶¶ 3-4; Exhibit A.<br>➢ Adams Decl. ¶¶ 14-21 |
| 59.   Plaintiffs suffered damages of $7,289,649.99 as a result of GET's refusal to allow Plaintiffs' to sell their stock (8,534,480 shares multiplied by $1.06 per share minus sales proceeds of $2,136,034.81 is $6,910,513.99; 1,900,000 shares multiplied by $0.45 per share minus sales proceeds of $475,864 is $379,136.00). | **DISPUTED**<br>➢ Zuckerman Decl. ¶¶ 30; 41-42.<br>➢ Taran Decl., Exhibit H |

| | |
|---|---|
| 60.    GET asserted in its initial disclosures made pursuant to Federal Rule of Civil Procedure 26(a)(1) that its "damages will be determined based on expert testimony." | **UNDISPUTED**<br>➢ Totino Decl. ¶ 11; Exhibit 10. |
| 61.    GET did not designate an expert witness to testify as to its damages in its Federal Rule of Civil Procedure 26(a)(2) expert witness disclosure and provided no expert report on the topic. | **UNDISPUTED**<br>➢ Totino Decl. ¶ 10; Exhibit 9. |

| **Defendant/Counterclaimant's Stated Fact** | **Evidence** |
|---|---|
| 62.    Get's corporate existence began in august 2007, when it filed the certificate of incorporation with the secretary of state of the state of Delaware. | ➢ Adams Decl. ¶ 1 |
| 63.    The Founder's Memo is silent as to the timing or the mechanics of the issuance of the stock.  However, the Founder's Memo provides for the founders to provide services to GET for a minimum of two years. | ➢ Loch Decl. ¶ 4 |
| 64.    At the time of the execution of the | ➢ *See* Adams Decl. ¶ 1 |

-14-

| | |
|---|---|
| Founder's Memo, there were no shareholders of GET. | |
| 65.    Petrucci and Loch approved the prospective issuance by GET of 12 millions hares of stock to Zuckerman in exchange for the assignment by Zuckerman to GET of six patent applications in reliance on misrepresentations by Zuckerman concerning the value of the patent applications. | ➢ Loch Decl. ¶ 5 |
| 66.    By the terms of the Assignment, Zuckerman assigned his rights in ten patent applications in exchange for 12 million shares of GET stock. | ➢ Loch Decl. ¶ 8 |
| 67.    On December 23, 2007, Zuckerman and Gordon Donavan, in his capacity as then-vice president and chief financial officer, executed an "Assignment of Invention, Priority Rights, and Rights to Apply for Patents." | ➢ Loch Decl. ¶ 8 |
| 68.    Marshall never promised to raise $25 million for GET. | ➢ Marshall Decl. ¶ 2 |
| 69.    Marshall did not join GET on the condition that he would raise fund for GET. | ➢ Marshall Decl. ¶ 2 |
| 70.    Even after Zuckerman returned | ➢ Adams Decl. ¶ 4 |

| | |
|---|---|
| some of his shares to GET to recapitalize GET, he retained a voting majority of GET stock until January 2008, and he remained a significant shareholder thereafter. | |
| 71.     GET never developed any products that were based on or related to any of the Patent Applications. | ➢ Loch Decl. ¶ 10 |
| 72.     Until recently, the technology for GET's performance products including motor oil, engine oil, and fuel additives is owned and was developed by Bio Tec Fuels & Chemicals LLC ("Biotec"), one of GET's suppliers. | ➢ Loch Decl. ¶ 11 |
| 73.     The technology for GET's appearance and cleaning products is owned and was developed by Inventek Colloidal Cleaners, LLC ("Inventek"), which granted GET a royalty-free license and an exclusive right to market, sell, and distribute products developed by them. | ➢ Loch Decl. ¶ 12 |
| 74.     GET's agreement with Inventek is a result of Loch's personal relationship with its owners. | ➢ Loch Decl. ¶ 12 |
| 75.     The Employment Agreement was | ➢ Adam Decl. ¶ 7 |

| | |
|---|---|
| not executed until some time after January 12, 2009. | |
| 76.    At the time of negotiating or executing the Employment Agreement, Zuckerman made no mention of Alkane to GET. | ➢ Adam Decl. ¶ 9 |
| 77.    On or about July 15, 2008, while Zuckerman was still an officer and director of GET, he formed Monster Diesel, Inc., a Nevada Corporation. | ➢ Taran Decl., Exhibit C |
| 78.    On January 29, 2009, Monster Diesel, Inc. was merged into Chanaral Resources, Inc., in order to form Alkane. | ➢ Taran Decl., Exhibit C |
| 79.    Since GET's inception and throughout 2008, Zuckerman sought to persuade GET to distribute a fuel-additive that would be marketed as a product called G-Boost. | ➢ Loch Decl. ¶ 13 |
| 80.    G-Boost was developed and manufactured by Biotec. | ➢ Loch Decl. ¶ 13 |
| 81.    After GET devoted funds to further develop G-Boost, GET's board of directors explained to Zuckerman that at that time, they did not have the capacity to bring this product up to GET's  "green" standards. | ➢ Loch Decl. ¶ 13 |
| 82.    GET never rejected outright the | ➢ Loch Decl. ¶ 15 |

| | |
|---|---|
| opportunity to further develop and market G-Boost. | |
| 83.     On January 29, 2009, Zuckerman "vended" intellectual property to the newly formed Alkane in exchange for 50,000,000 shares of Alkane stock. | ➢ Taran Decl., Exhibit C |
| 84.     On April 7, 2009, GET sent Zuckerman a letter setting forth certain matters relating to his resignation and advised him that he would *continue* to be an "affiliate" for purposes of Rule 144 *through and including* May 1, 2009. The April 7 letter did not state that he would cease to be an "affiliate" on May 2, 2009. | ➢ Adams Decl. ¶ 13 |
| 85.     On January 11, 2008, Zuckerman wrote to FAST, instructing FAST to release the legend on Certificate # 4292 for 500,000 shares. | ➢ Taran Decl., Exhibit E |
| 86.     On July 12, 2008, Sandra Zuckerman, Zuckerman's wife and the president of Treya wrote to FAST, requesting the cancellation of certificate # 4370 for 1,833,333 shares and the issuance of two new certificates without a restrictive legend. | ➢ Taran Decl., Exhibit E |
| 87.     On September 8, 2008, Lora | ➢ Taran Decl., Exhibit E |

| | |
|---|---|
| Jakobsen wrote to FAST, requesting the cancellation of Certificate # 4350 for 4,900,000 shares and the issuance of ten new certificates without a restrictive legend. | |
| 88.   Treya was selling significant amounts of its shares of GET stock in January 2009 and February 2009. | ➢ Taran Decl., Exhibit F |
| 89.   At the time of Zuckerman's resignation, he had at least a 20% share in GET. | ➢ Adams Decl. ¶ 13 |
| 90.   The 1.9 million shares issued to Treya were not owed to Zuckerman under the Founder's Memo. | ➢ Loch Decl. ¶ 6 |
| 91.   Alkane markets and distributes products in GET's line of business and is a competitor to GET. | ➢ Loch Decl. ¶ 17 |
| 92.   The share certificates issued to Zuckerman by GET included restrictive legends with the following language: "[t]he shares represented hereby have not been registered under the Securities Act of 1933, as amended, and may not be sold, transferred, assigned, pledged, hypothecated or otherwise disposed of unless and until registered under such Act or unless the company has received | ➢ Adams Decl. ¶ 14, Exhibit E. |

| | |
|---|---|
| an opinion of counsel or other evidence satisfactory to the company and its counsel that such registration is not required." | |
| 93.    On December 20, 2010, GET served plaintiffs its "Amended Disclosure Statement Pursuant to Rule 26(a) Concerning Computation of Damages" | ➢ Taran Decl., Exhibit K |

Dated:  December 20, 2010

WILK AUSLANDER LLP
    Jessica Taran

By:_____/s/ Jessica Taran_____
                JESSICA TARAN

MUNGER TOLLES & OLSON LLP
    Richard St. John
    Tina Charoenpong
Attorneys for Defendant / Counter-claimant
GREEN EARTH TECHNOLOGIES, INC.

451688v3

-20-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28